## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES G. SLOAN** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 08-1423** |
| | : | |
| **UNITED STATES OF AMERICA** | : | |
| **Defendant.** | : | |

**DuBois, J.**                                                    **MARCH 25, 2009**

### M E M O R A N D U M

### I.     INTRODUCTION

This case arises out of the service of plaintiff, James G. Sloan, as a Qualified Member of the Engineer Department onboard the U.S.N.S. Mendonca, a ship owned by defendant, the United States of America. Plaintiff alleges that he suffered injuries caused by the negligence of defendant and the unseaworthiness of the vessel.

Presently before the Court is Defendant United States of America's Motion for Summary Judgment. For the reasons set forth below, defendant's motion is granted in part and denied in part. The Court grants defendant's motion with respect to plaintiff's Jones Act claims for assault and intentional infliction of emotional distress and plaintiff's unseaworthiness claim based on assault. The Court denies defendant's motion in all other respects.

### II.     FACTUAL BACKGROUND

At all times relevant to this case, the U.S.N.S. Mendonca ("Mendonca") was owned by defendant, the United States of America, through the Military Seaman Command; it was being operated by American Overseas Marine ("American Overseas"), a civilian contractor. (Def.'s Mot. 2; Pl.'s Resp. 1.) On June 10, 2006, plaintiff, James G. Sloan, began serving as a Qualified

Member of the Engineer Department ("QMED") aboard the Mendonca.  (Def.'s Mot. ¶ 1; Pl.'s

Resp. 1; Master's Report of Alleged Harassment 1, Sept. 7, 2006, Ex. 1 to Pl.'s Resp.; Sloan

Dep., July 29, 2008, 34:20–22.[1])  Plaintiff worked as a watch stander in the engine room from

12:00am to 4:00am and from 12:00pm to 4:00pm.  (Def.'s Mot. 2; Pl.'s Resp. 2; Sloan Dep.

34:20–35:4.)  Plaintiff's watch partner was Third Engineer Trinity Adam Ippolito.  (Sloan Dep.

35:5–7; Hopkins Dep., N.D., 30:4–7, Ex. 3 to Pl.'s Resp.; Ippolito Dep., N.D., 36:23–37:14, Ex.

4 to Pl.'s Resp.)  Plaintiff's superiors included Captain Jay C. Burgess, Chief Engineer Roy

Graham, and First Engineer Andrew Hopkins, who was plaintiff's immediate superior in the

engine room.  (Def.'s Mot. 2; Pl.'s Resp. 2–3; Sloan Dep. 51:10–11.)

     In August 2006, on two occasions, plaintiff overheard First Engineer Hopkins use racial

epithets with regard to other members of the ship's crew.  (Def.'s Mot. 2; Pl.'s Resp. 3; Sloan

Dep. 42:5–44:11; Ippolito Dep. 19:2–20:18.)  Plaintiff is a light-skinned black male; according to

the deposition testimony of plaintiff and First Engineer Hopkins, at the time that First Engineer

Hopkins made the racial comments, he did not know that plaintiff was black.  (Def.'s Mot. 2–4;

Pl.'s Resp. 3; Sloan Dep. 42:5–16, 107:11–108:4; Hopkins Dep. 30:10–21.)  In the first incident,

First Engineer Hopkins was questioning QMED Justin Van Pelt as to why QMED Alexander

Young, a black male, was not in the engine room.  (Def.'s Mot. 3; Sloan Dep. 42:24–43:8.)  First

Engineer Hopkins told QMED Van Pelt to find QMED Young and "tell him to get his black ass

down here."  (Def.'s Mot. 3; Pl.'s Resp. 3; Sloan Dep. 43:11–17.)  In the second incident, a few

_____

     [1] Defendant included excerpts of plaintiff Sloan's deposition as Exhibit A to the Motion
for Summary Judgment.  Plaintiff included excerpts of plaintiff Sloan's deposition as Exhibit 2 to
plaintiff's response.  To avoid unnecessary citation, the Court will cite to the relevant pages of
plaintiff Sloan's deposition without identifying in which exhibit those pages may be found.

days after the first, First Engineer Hopkins referred to QMED Young as a "lazy nigger" and a "black mother fucker."  (Def.'s Mot. 3; Pl.'s Resp. 3; Sloan Dep. 44:1–17; Ippolito Dep. 19:2–20:18.)  After plaintiff overheard the second comment, he informed First Engineer Hopkins that he was black, and First Engineer Hopkins responded with a dirty look.  (Def.'s Mot. 2–4; Pl.'s Resp. 3; Sloan Dep. 44:21–23.)  Third Engineer Ippolito witnessed this exchange.  (Pl.'s Resp. 4; Ippolito Dep. 72:19–23.)  A few days later, plaintiff spoke with Captain Jay C. Burgess regarding the conduct of First Engineer Hopkins.  (Pl.'s Resp. 12–13; Sloan Dep. 46:7–47:6, 114:10–20.)  According to plaintiff, Captain Burgess discussed plaintiff's concerns with First Engineer Hopkins and Chief Engineer Roy Graham.  (Pl.'s Resp. 5, 13; Sloan Dep. 114:21–115:9.)

After plaintiff informed First Engineer Hopkins that he was black and spoke with Captain Burgess, he stopped receiving overtime; plaintiff testified that these events were causally related. (Def.'s Mot. 2–4; Pl.'s Resp. 3; Sloan Dep. 42:5–16.)  The morning after plaintiff told First Engineer Hopkins that he was black, August 12 or 13, plaintiff went down to the engine room to work his regular overtime hours beginning at 8:00am; the ship's elevator was broken, so plaintiff had to walk down approximately 120 steps.  (Def.'s Reply 8–9; Pl.'s Resp. 4; Sloan Dep. 45:1–7, 113:2–17; Ippolito Dep. 48:8–49:7; Master's Report of Alleged Harassment 3.)  Once plaintiff arrived in the engine room, First Engineer Hopkins said that there were no overtime hours available for plaintiff or Third Engineer Ippolito.  (Def.'s Reply 8–9; Pl.'s Resp. 4; Sloan Dep. 45:1–7.)  The same pattern occurred for the next two or three days; plaintiff then stopped going down to the engine room to work overtime hours.  (Def.'s Reply 8–9; Pl.'s Resp. 4–5; Sloan Dep. 45:7–23, 114:1–9; Ippolito Dep. 36:17–38:3.)

On August 17, 2006, after plaintiff informed First Engineer Hopkins that he was black, plaintiff was adding chemicals to the main engine air cleaner dosing tank, one of his usual duties. (Pl.'s Resp. 5; Sloan Dep. 55:23–57:3; Master's Report of Alleged Harassment 2.)  He was experienced at this task, but on this day, he was splashed with the chemicals on his face and body and required medical attention.  (Pl.'s Resp. 5; Sloan Dep. 66:7–24; Ippolito Dep. 51:13–17; Hopkins Dep. 53:10–54:7; Master's Report of Alleged Harassment 2.)  Plaintiff testified that he was splashed because First Engineer Hopkins had changed the position of the tank's valves without telling plaintiff.  (Pl.'s Resp. 5; Sloan Dep. 58:5–12, 60:5–24; Master's Report of Alleged Harassment 2.)  At his deposition, First Engineer Hopkins denied the allegation that he had moved the valves.  (Hopkins Dep. 54:8–14.)

Also in August 2006, Chief Engineer Graham decided to operate the ship with an unmanned engine room; this entailed taking the crew off watch and assigning them to day work. (Def.'s Mot. 4; Pl.'s Resp. 6; Sloan Dep. 50:10–51:11.)  Plaintiff testified that, based on his experience working in engine rooms since 1963, Chief Engineer Graham's decision was dangerous and made him feel unsafe.  (Pl.'s Resp. 6; Sloan Dep. 49:15–51:19, 90:6–14.)  The decision to transition to an unmanned engine room was to go into effect on August 27, 2006. (Pl.'s Resp. 6; Sloan Dep. 51:12–17.)

Plaintiff suffered from high blood pressure, which he usually controlled with medication. (Def.'s Mot. 4; Pl.'s Resp. 2, 7; Sloan Dep. 108:19–109:5.)  According to plaintiff, in August 2006, due to the work situation in the engine room and his deteriorating relationship with First Engineer Hopkins, plaintiff's blood pressure began to rise and was no longer adequately controlled by his medication.  (Def.'s Mot. 4; Pl.'s Resp. 2, 7; Sloan Dep. 38:5–39:10,

4

116:6–17.)  Shortly thereafter, plaintiff requested medical attention, but Captain Burgess told

plaintiff that he would have to wait to see a doctor until the ship called in Fujairah, about a week

later.  (Def.'s Mot. 4–5; Pl.'s Resp. 2, 7; Sloan Dep. 39:3–40:20, 116:6–117:8, 128:2–14.)  When

plaintiff's health did not improve, he went back to Captain Burgess on August 26 and said that he

wanted to get off of the ship.  (Def.'s Mot. 5; Sloan Dep. 48:12–19, 118:1–119:14; Master's

Report of Alleged Harassment 1.)  Captain Burgess told plaintiff that he would have to pay his

own way home, and plaintiff agreed to do so.  (Def.'s Mot. 5; Sloan Dep. 48:19–24, 119:15–19;

Ippolito Dep. 41:2–8.)

      On August 25 or August 26, 2006, Chief Engineer Graham asked plaintiff why he was no

longer working overtime, and plaintiff responded that it was due to First Engineer Hopkins.

(Def.'s Mot. 4; Sloan Dep. 90:18–91:4.)  First Engineer Hopkins overheard plaintiff's remark

and called him a "fucking liar."  (Def.'s Mot. 4; Pl.'s Resp. 6; Sloan Dep. 90:18–93:7; Ippolito

Dep. 43:3–44:3.)  This was emotionally upsetting to plaintiff, who started arguing with First

Engineer Hopkins.  (Ippolito Dep. 43:3–44:5.)  Plaintiff and Third Engineer Ippolito testified that

First Engineer Hopkins jumped in plaintiff's face as if he was going to fight, causing Chief

Engineer Graham to step in between plaintiff and First Engineer Hopkins.  (Pl.'s Resp. 6; Sloan

Dep. 90:18–93:7; Ippolito Dep. 43:3–44:5.)  Defendant and First Engineer Hopkins neither

confirm nor deny plaintiff's account that First Engineer Hopkins physically threatened him.  The

altercation between plaintiff and First Engineer Hopkins did not come to physical blows.  (Def.'s

Mot. 5; Sloan Dep. 93:8–16.)  Plaintiff left the engine room, and First Engineer Hopkins

commented that plaintiff should be fired.  (Def.'s Mot. 4; Sloan Dep. 128:15–129:24; Ippolito

Dep. 44:19–23; Master's Report of Alleged Harassment 4.)  This comment was overheard by

Third Engineer Ippolito and QMED Young.  (Sloan Dep. 94:6–95:23, 128:15–129:24; Ippolito

Dep. 44:19–23; Master's Report of Alleged Harassment 4.)

Immediately following this incident, plaintiff began to suffer from severe head pain and

numbness, and his blood pressure was very high and not responding to his medication.  (Pl.'s

Resp. 6; Sloan Dep. 125:16–127:15, 150:1–12.)  On August 27, 2006, at about 12:50pm, plaintiff

suffered a stroke while he was in the engine room.  (Def.'s Mot. 5; Pl.'s Resp. 8; General

Dynamics, American Overseas Marine, Vessel Report of Injury or Illness to Crew, Ex. B to

Def.'s Mot.)  Third Engineer Ippolito was present in the engine room when plaintiff began

complaining of chest, back, and shoulder pain; Third Engineer Ippolito thought that plaintiff was

having a heart attack and called the medical officer.  (Ippolito Dep. 51:18–52:24.)  A doctor

(navy reservist) onboard the ship also came to plaintiff's aid.  (Ippolito Dep. 52:24–53:1.)  The

doctor insisted that plaintiff needed to receive medical treatment in the next twenty-four hours.

(Pl.'s Resp. 8; Sloan Dep. 54:19–55:6, 99:3–100:19; Master's Report of Alleged Harassment 1.)

Upon the doctor's advice, Captain Burgess turned the ship around and pulled into harbor; a boat

took plaintiff from the ship to Fujairah on August 28, 2006.  (Def.'s Mot. 5; Pl.'s Resp. 8; Sloan

Dep. 100:20–101:4.)

Plaintiff's expert witness in neurology, Dr. Heidar K. Jahromi, concluded that plaintiff

had suffered a stroke on August 27, 2006.  (Report of Dr. Jahromi 2, Jan. 22, 2009, Ex. 5 to Pl.'s

Resp.)  Dr. Jahromi performed a physical examination of plaintiff and reviewed plaintiff's

medical records and medical history.  (Id. 1–2.)  Dr. Jahromi also considered a letter from

plaintiff's counsel that requested that he treat as true certain facts concerning the conditions

onboard the Mendonca at the time of plaintiff's stroke.  (Id. at 2; Letter from Stanley B. Gruber,

6

Esq. to Dr. Heidar K. Jahromi 1–3 (Jan. 6, 2009), Ex. 7 to Pl.'s Resp.)  Based on this

information, it was his "professional opinion with reasonable amount of medical certainty that

there is causal relation between what went on [onboard] the ship that day and [plaintiff's]

stroke."[2]  (Report of Dr. Jahromi at 2.)

Prior to the incident involving plaintiff, American Overseas Shipping Corporation had

never "received any complaint concerning [First Engineer] Hopkins in matters involving racial

prejudice, inappropriate conduct or work place violations."  (Booth Affidavit ¶ 3, Oct. 14, 2008,

Ex. C to Def.'s Mot.)  First Engineer Hopkins's previous employers did not notify American

Overseas Shipping Corporation of any complaints regarding racial prejudice or work place

misconduct against First Engineer Hopkins.  (Id. ¶ 4.)

## III.    PROCEDURAL HISTORY

On March 25, 2008, plaintiff filed a Complaint for damages pursuant to the Public

Vessels Act, 46 U.S.C. §§ 31101–31113, and the Suits in Admiralty Act, 46 U.S.C.

§§ 30901–30918.  Plaintiff invoked this Court's admiralty and maritime jurisdiction.  (Compl.

¶ 4.)  Plaintiff alleged that he had sustained injuries "as a result of the carelessness and

negligence of the Defendant and its agents, servants, crewmembers and officers and/or the

---

[2] Dr. Jahromi stated in his report that "there is causal relation between what went on [onboard] the ship *that day* and [plaintiff's] stroke." (Report of Dr. Jahromi at 2 (emphasis added).)  The facts in the letter on which he based his opinion, however, did not concern only what happened on a single day.  Instead, the letter described plaintiff's experiences on the Mendonca during the month of August 2006 and asked Dr. Jahromi to treat these facts as true. (Letter from Stanley B. Gruber, Esq. to Dr. Heidar K. Jahromi 1–3.)  As Dr. Jahromi said that he considered all of these facts in forming his professional opinion, for purposes of the Motion for Summary Judgment, the Court will construe Dr. Jahromi's statement as expressing his opinion that there was a causal relationship between what occurred onboard the Mendonca in August 2006 and plaintiff's stroke.

unseaworthiness of its vessel, the U.S.N.S. Mendonca, and its crew and officers."  (Id. ¶ 8.)  The

Complaint sought judgment against defendant in an amount in excess of $75,000 for, *inter alia*,

physical and mental injuries, medical care, pain and suffering, and lost wages.  (Id. ¶ 9.)

On November 25, 2008, defendant filed the instant Motion for Summary Judgment.  In

the motion, defendant seeks entry of judgment in its favor on all claims asserted by plaintiff.

## IV.    STANDARD OF REVIEW

A court should grant summary judgment if "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A factual dispute is material when it "might affect the outcome of the suit under the

governing law . . . ."  Id.  In considering a motion for summary judgment, the "facts must be

viewed in the light most favorable to the party opposing summary judgment."  Int'l Raw

Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990) (citation omitted).  The

party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory

allegations or suspicions" to support its claim.  Fireman's Ins. Co. of Newark, N.J. v. DuFresne,

676 F.2d 965, 969 (3d Cir. 1982) (citations omitted).

## V.    DISCUSSION

Plaintiff's Complaint states that plaintiff "sustained the injuries which are the subject of

this action as a result of the carelessness and negligence of the Defendant and its agents, servants,

crewmembers and officers and/or the unseaworthiness of its vessel, the U.S.N.S. Mendonca, and its crew and officers."  (Compl. ¶ 8.)  In Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment of Defendant United States of America, plaintiff develops the general allegations of the Complaint and posits two theories of liability—negligence under the Jones Act and unseaworthiness.  This Memorandum will examine each theory in turn.

### A.    Jones Act

The Jones Act, 46 U.S.C. § 30104(a), provides, in relevant part, that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer.  Laws of the United States regulating recovery for personal injury to . . . a railway employee apply to an action under this section."  The reference to "[l]aws of the United States regulating recovery for personal injury to . . . a railway employee" incorporates the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, "[t]hus, cases interpreting the FELA provide guidance for the interpretation of the Jones Act."  Perna v. Arco Marine, Inc., 2001 A.M.C. 1147, 1149 (3d Cir. 2001); accord Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 546–47 (1960); Barclay v. Keystone Shipping Co., 128 F. Supp. 2d 237, 243 (E.D. Pa. 2001).

The Jones Act imposes a duty upon the owner of a vessel "to furnish a reasonably safe place for a seaman . . . to perform his chores . . . , the breach of which results in liability for negligence . . . ."  Earles v. Union Barge Line Corp., 486 F.2d 1097, 1104 (3d Cir. 1973).  "Under the Jones Act, an employer is liable for injury suffered by a seaman through the negligence of the employer or a fellow employee."  Wilburn v. Maritrans GP, Inc., 139 F.3d 350, 357 (3d Cir. 1998) (citations omitted).  A relaxed standard of causation applies under FELA and, by reference, under the Jones Act.  Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 543 (1994).

9

"Causation is satisfied if 'the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . .'" <u>Wilburn</u>, 139 F.3d at 357 (citing <u>Rogers v. Missouri Pac. R.R. Co.</u>, 352 U.S. 500, 506 (1957)).  The test for causation, "often described as a featherweight causation standard, allows a seaman to survive summary judgment by presenting even the slightest proof of causation."  <u>Brogan v. United New York Sandy Hook Pilots' Ass'n</u>, 213 F. Supp. 2d 432, 437 (D.N.J. 2002) (quotation marks & citation omitted).

Plaintiff presents four theories of conduct by defendant that violated the duty imposed by the Jones Act to furnish a reasonably safe place to work.  The Court discusses each theory in turn.

### 1.      Assault

Plaintiff argues that the incident in which First Engineer Hopkins "got directly in [his] face and called him a 'fucking liar'" constituted the tort of assault.  (Pl.'s Resp. 12–13.)  For the purposes of the following discussion, the Court will assume, *arguendo*, that this conduct amounted to assault.  Assault of a crew member by a superior officer is an intentional tort. "Despite the language of FELA, which facially applies only to negligence claims, courts have allowed plaintiffs to seek recovery under FELA for intentional torts as well."  <u>Allen v. Nat'l R.R. Passenger Corp.</u>, 90 F. Supp. 2d 603, 613 (E.D. Pa. 2000) (citation omitted).  A FELA or Jones Act plaintiff "may prevail in an intentional tort case by showing either that the intentional tort was committed in furtherance of the employer's objectives or that the employer was negligent in hiring, supervising, or failing to fire the employee."  <u>Lancaster v. Norfolk & W. Ry. Co.</u>, 773 F.2d 807, 818 (7th Cir. 1985); <u>accord</u> <u>Sobieski v. Ispat Island, Inc.</u>, 413 F.3d 628, 631–35 (7th

10

Cir. 2005).

Under the first of the two <u>Lancaster</u> branches of liability—*respondeat superior*—the employer is liable for an intentional tort if it is "committed in the discharge of [the employee's] duties and in furtherance of the work of the employer's business." <u>Jamison v. Encarnacion</u>, 281 U.S. 635, 641 (1930), <u>superseded by statute on other grounds</u>. An employer is not liable under *respondeat superior* "when the motive for the employee's intentional tort is personal . . . ." <u>Lancaster</u>, 773 F.2d at 819. In the instant case, First Engineer Hopkins called plaintiff a "fucking liar" and, according to plaintiff, menaced plaintiff physically because he was upset that plaintiff blamed him for plaintiff's failure to work overtime hours. (Def.'s Mot. 4; Pl.'s Resp. 6; Sloan Dep. 90:18–93:7; Ippolito Dep. 43:3–44:5.) First Engineer Hopkins's conduct towards plaintiff was motivated by "personal animus" and was not related to his disciplinary or other duties. <u>See Civil v. Waterman Steamship Corp.</u>, 217 F.2d 94, 98 (2d Cir. 1954). As such, defendant is not liable for the assault under *respondeat superior*. <u>See Lykes Bros. S. S. Co. v. Grubaugh</u>, 128 F.2d 387, 391 (5th Cir. 1942) ("[No case] has held the master liable where . . . the assault occurred as the result of anger over matters having nothing to do with the exercise, over the assailed, of authority delegated by the master to the assailant in the discharge of duties with which the master had charged him.").

Under the second <u>Lancaster</u> branch of liability—direct negligence—defendant may be liable for First Engineer Hopkins's actions if it "had information about [First Engineer Hopkins's] propensities, and failed to act on the information." 773 F.2d at 820. To establish liability in these circumstances, a plaintiff need not show that the tort was committed in furtherance of the defendant's business. <u>Id.</u> at 818. A plaintiff must prove, however, that "(1)

11

the assailant is a person of known vicious character and (2) the shipowner knew or should have known of the crew member's violent propensities." Wiradihardja v. Bermuda Star Line, Inc., 802 F. Supp. 989, 993 (S.D.N.Y. 1992) (internal citations omitted); see also Harrison v. Missouri Pac. R.R. Co., 372 U.S. 248, 249 (1963) ("[T]he fact that 'the foreseeable danger was from intentional or criminal conduct is irrelevant; [the employer] nevertheless had a duty to make reasonable provision against it." (citation omitted)).

In the instant case, plaintiff has produced no evidence that defendant knew of any propensity towards violence on the part of First Engineer Hopkins.  Defendant presented evidence to the contrary; Compliance Officer Robin Booth stated that "prior to the incident involving James Sloan, [American Overseas had] not received any complaint concerning Andrew Hopkins in matters involving racial prejudice, inappropriate conduct or work place violations." (Booth Aff. ¶ 3, Oct. 14, 2008, Ex. C to Def.'s Mot.)  American Overseas also was not put on notice regarding such tendencies by any of First Engineer Hopkins's previous employers.  (Id. ¶ 4.)  Accordingly, defendant is not liable under the direct negligence branch.

As the evidence of record supports neither *respondeat superior* nor direct negligence, defendant is not liable for the assault allegedly committed by First Engineer Hopkins. Accordingly, the Court grants defendant's Motion for Summary Judgment on this claim.

## 2.    Intentional Infliction of Emotional Distress

In the Complaint, plaintiff alleges that as a result of the conduct of First Engineer Hopkins and others, he sustained "emotional injuries" and "mental anguish."  (Compl. ¶ 9.) While plaintiff does not specify a cause of action for this emotional suffering, the Court will construe the Complaint as pleading a claim for intentional infliction of emotional distress.

12

Whether a claim of intentional infliction of emotional distress is cognizable under FELA and, derivatively, the Jones Act remains an open question.  See, e.g., Higgins v. Metro-North R.R. Co., 143 F. Supp. 2d 353, 361 (S.D.N.Y. 2001); Yballa v. Sea-Land Servs., Inc., 919 F. Supp. 1428, 1436–37 (D. Haw. 1995); Teague v. Nat'l R.R. Passenger Corp., 708 F. Supp. 1344, 1350–51 (D. Mass. 1989).  The Court need not decide this issue, however, as it concludes that the conduct complained of by plaintiff does not reach the level required to sustain such a claim.

To recover for intentional infliction of emotional distress, a plaintiff must demonstrate conduct by a defendant of "'an extreme and outrageous type.'"  Cox v. Keystone Carbon, Inc., 861 F.2d 390, 395 (3d Cir. 1988) (quoting Rineheimer v. Luzerne County Cmty. Coll., 539 A.2d 1298, 1305 (Pa. Super. 1988)); accord Barclay v. Keystone Shipping Co., 128 F. Supp. 2d 237, 244 (E.D. Pa. 2001); Yballa, 919 F. Supp. at 1437.  Moreover, the Third Circuit has noted that "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis of recovery for the tort of intentional infliction of emotional distress."  Cox, 861 F.2d at 395 (citation omitted).

In cases involving conduct similar to that alleged in this case, courts declined to find that the conduct reached the level of outrageousness necessary to prevail on a claim for intentional infliction of emotional distress.  In Barclay, there was evidence that plaintiff's supervisor, the chief engineer, had singled plaintiff out for harassment and acted toward him in a threatening manner.  128 F. Supp. at 240.  In addition, other members of the engineering department made racially derogatory comments in plaintiff's presence, but they were not directed toward him.  Id. Plaintiff's quarters were also entered without his consent.  Id. at 241.  The court held that "given the very limited type of objectionable behavior that constitutes intentional infliction of emotional

13

harm, the ill-treatment of [plaintiff] by his superiors and co-workers does not provide a basis for his claim." Id. at 245 (citation omitted).

Similarly, in Yballa, the court held that misconduct including, *inter alia*, verbal harassment and ridicule, a false disciplinary report, and pressure to work overtime did not constitute intentional infliction of emotional distress. 919 F. Supp. at 1437–38; see also Perna v. Arco Marine, Inc., 2001 A.M.C. 1147, 1150 n.1 (3d Cir. 2001) ("[T]he petty harassment, disagreements, and insults described by [plaintiff] do not reach an extreme or outrageous level."). In comparison to the facts presented in these cases, the facts in the instant case also do not reach a sufficient level of outrageousness. Accordingly, the Court concludes that plaintiff has not presented the evidence necessary to prevail on a claim of intentional infliction of emotional distress. Thus, the Court grants defendant's Motion for Summary Judgment on this claim.

### 3.    Negligent Infliction of Emotional Distress

Claims for negligent infliction of emotional distress are cognizable under the Jones Act. Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 550 (1994). As negligent infliction of emotional distress is not an intentional tort, a plaintiff "need not establish *respondeat superior* liability or direct employer negligence liability to recover against an employer. Rather, a plaintiff may prevail merely by producing evidence that an employee was negligent and caused plaintiff injury." Allen v. Nat'l R.R. Passenger Corp., 90 F. Supp. 2d 603, 613 (E.D. Pa. 2000) (internal citation omitted). In Gottshall, the Supreme Court held that "as part of its 'duty to use reasonable care in furnishing its employees with a safe place to work,' a railroad has a duty under FELA to avoid subjecting its workers to negligently inflicted emotional injury." 512 U.S. at 550 (internal citation omitted). Concerned with the prospect of "unpredictable and nearly infinite liability for

14

defendants," the Court restricted liability to only those injuries "compensable under the terms of the zone of danger test."  Id. at 552, 555.  "[T]he zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct."  Id. at 547–48.  To apply the zone of danger test, courts should look to the common law.  Id. at 543–44.

The courts have further clarified both prongs of the Gottshall zone of danger test.  In Metro-North Commuter Railroad Company v. Buckley, 521 U.S. 424, 432 (1997), the Supreme Court held that "the words 'physical impact' do not encompass every form of 'physical contact.'" In particular, the Court held that when the plaintiff was presently asymptomatic, "physical impact" did not include "a simple physical contact with a substance that might cause a disease at a substantially later time—where that substance, or related circumstance, threatens no harm other than that disease-related risk."  Id. at 430.  Instead, examining the common law, the Court noted that "in each case where recovery for emotional distress was permitted, the case involved a threatened physical contact that caused, or might have caused, immediate traumatic harm."  Id. (collecting cases); see also Allen, 90 F. Supp. 2d at 614 (denying recovery to plaintiff who alleged "merely harmless touching"); Higgins v. Metro-North R.R. Co., 143 F. Supp. 2d 353, 359 (S.D.N.Y. 2001) (denying recovery to plaintiff who was slapped on the buttocks).  In Nelson v. Metro-North Commuter Railroad, 235 F.3d 101, 110, 113 (2d Cir. 2000), the court noted that the Supreme Court had not provided a definition of the term "immediate risk of physical harm" and held that "even when temporally very close, the risk of physical harm to the plaintiff must be, at the very least, more than minimal."  The court then held that this test was not satisfied in the case at hand, in which plaintiff alleged that a train conductor who had sexually harassed her in

15

the past was present at the train station where she worked.  Id. at 113.

The aforementioned authority makes clear that plaintiff in this case may recover for any emotional distress he allegedly suffered at the hands of First Engineer Hopkins if he suffered a physical impact or was placed in immediate risk of physical harm.  Plaintiff has presented evidence that First Engineer Hopkins called him a "fucking liar"; this upset plaintiff emotionally, and he began arguing with First Engineer Hopkins.  (Pl.'s Resp. 6; Sloan Dep. 90:18–93:7; Ippolito Dep. 43:3–44:5.)  According to plaintiff and Third Engineer Ippolito, First Engineer Hopkins also menaced plaintiff physically, such that Chief Engineer Graham had to step in between the two men to prevent a physical altercation.  (Pl.'s Resp. 6; Sloan Dep. 90:18–93:7; Ippolito Dep. 43:3–44:5.)  This evidence presents a genuine issue of material fact as to whether First Engineer Hopkins physically threatened plaintiff.  If the finder of fact concludes that plaintiff did face an immediate risk of physical harm that was more than minimal, under the Gottshall zone of danger test, plaintiff may be able to recover for negligent infliction of emotional distress.  Accordingly, the Court denies defendant's Motion for Summary Judgment on the claim of negligent infliction of emotional distress.[3]

### 4.    Negligence

In the motion, defendant construes plaintiff's Complaint as asserting a claim for negligent infliction of emotional distress and analyzes the facts under the Gottshall zone of danger test.

---

[3] Plaintiff also argues that "[t]he bad conditions in the engine room, including undermanning and the defective condition of certain valves which resulted in the physical impact of a[] chemical spray directly on Plaintiff's face" satisfy the zone of danger test.  (Pl.'s Resp. 18–19).  As the Court ruled that the Gottshall zone of danger test is satisfied for the purposes of the Motion for Summary Judgment by the alleged assault by First Engineer Hopkins, the Court declines to rule on plaintiff's additional argument.

(Def.'s Mot. 9–14.)  Plaintiff counters that the Court should consider his case not one for negligent infliction of emotional distress but one for negligent infliction of a physical injury, i.e., negligence.  (Pl.'s Resp. 17–18.)  In other words, plaintiff contends that even if the Court declines to consider the emotional abuse that plaintiff allegedly suffered at the hands of First Engineer Hopkins, there is sufficient evidence of other negligent conduct that resulted in physical injury—a stroke—to state a claim under the Jones Act.  Plaintiff presents four such instances of negligence:  (1) "the bad conditions in the engine room, including undermanning and the defective condition of certain valves" which resulted in plaintiff being sprayed with chemicals; (2) the inoperative elevator; (3) the assault by First Engineer Hopkins; and (4) the initial refusal by Captain Burgess to "honor Plaintiff's request for medical attention."  (Id. at 18.)  The Court has addressed the alleged assault in Part V.A.1, *supra*, and concluded that defendant could not be held liable for this intentional action by First Engineer Hopkins.

In Walsh v. Consolidated Rail Corporation, 937 F. Supp. 380, 382 (E.D. Pa. 1996), the plaintiff worked a twelve-hour shift, checked into a hotel, was called back to work that evening, and then suffered a stroke.  Plaintiff had informed his employer that he suffered from hypertension, but Consolidated Rail Corporation ("Conrail") "continued to assign [plaintiff] to stressful jobs, the exigencies of which were beyond his physical capacity.  This allegedly aggravated his condition and increased the likelihood that he would suffer a stroke."  Id. Considering Gottshall, the Walsh court held that "[t]he facts presented in the instant case invoke neither the letter nor the spirit of the Gottshall decision."  Id. at 387.  Plaintiff, the court concluded, "presents a claim for negligent infliction of a *physical* injury completely distinct from the emotional and mental injuries addressed in Gottshall."  Id. (emphasis in original).  The jobs

17

assigned to plaintiff "aggravated his preexisting condition and caused a purely physical, traumatic injury. [Plaintiff] does not assert that Conrail's negligence caused a mental or emotional injury which then manifested itself through physical symptoms . . . ." Id. at 388; see also Bailey v. Norfolk & W. Ry Co., 942 S.W. 2d 404, 410 (Mo. Ct. App. 1997) (holding that plaintiff's alleged heart disease and gastritis were physical injuries caused by inadequate sleeping facilities).

Unlike in Walsh, plaintiff in the instant case was not assigned to work beyond his physical capacity after notifying his employer of a preexisting physical condition. Yet plaintiff did suffer from hypertension, and he argues that this condition was aggravated by defendant's negligence, including bad conditions in the engine room, a non-working elevator, and Captain Burgess's decision to deny plaintiff's initial request for medical assistance, resulting in a stroke.[4] (Pl.'s Resp. 17–18.) Under well-established principles of tort law, "when a defendant's wrongful act or omission aggravates or accelerates a plaintiff's pre-existing condition . . . , such defendant is liable . . . ." Milos v. Sea-Land Serv., Inc., 478 F. Supp. 1019, 1023 (S.D.N.Y. 1979), aff'd, 662 F.2d 574 (2d Cir. 1980). In the Jones Act context, a defendant "is responsible for any aggravation or acceleration of an existing disease or infirmity if the defendant's breach of duty 'played any part, even the slightest' in producing the injury." Gorman v. Prudential Lines, Inc., 637 F. Supp. 879, 882 (S.D.N.Y. 1986) (citation omitted).

Plaintiff contends that defendant's conduct was a breach of its duty under the Jones Act to use reasonable care to provide a safe place to work. In support of his argument, plaintiff presents

---

[4] The Walsh court noted that "FELA allows claims for the negligent administration of medical care" that result in physical injury. 937 F. Supp. at 391 n.7.

deposition testimony that the ship's elevator was broken, that plaintiff was splashed while adding chemicals to the main engine air cleaner dosing tank, that Chief Engineer Graham had decided to transition to an unmanned engine room, that people were "messing around" with equipment in the engine room and setting off alarms, and that Captain Burgess denied plaintiff's initial request for medical attention.  With respect to causation, the report of plaintiff's expert concluded, "with reasonable amount of medical certainty that there is causal relation between what went on [onboard] the ship that day and [plaintiff's] stroke."  (Report of Dr. Jahromi 2, Jan. 22, 2009, Ex. 5 to Pl.'s Resp.)  This evidence is sufficient to withstand summary judgment.  Thus, the Court denies defendant's Motion for Summary Judgment on this claim.

     **B.**    **Unseaworthiness**

     The doctrine of seaworthiness imposes an absolute duty upon the owner of a ship "to furnish a vessel and appurtenances reasonably fit for their intended use.  The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service."  Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960) (citing Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 337–39 (1955)).  The condition of unseaworthiness encompasses a number of circumstances:  "[The vessel's] gear might be defective, her appurtenances in disrepair, her crew unfit.  The number of men assigned to perform a shipboard task might be insufficient. . . . For any of these reasons, or others, a vessel might not be reasonably fit for her intended service."  Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499 (1971) (internal citations omitted).

     The Supreme Court has repeatedly insisted that the cause of action for unseaworthiness

19

"is a remedy separate from, independent of, and additional to other claims against the shipowner, whether created by statute [e.g., the Jones Act] or under general maritime law." Id. at 498. Specifically, "liability based on unseaworthiness is wholly distinct from liability based on negligence." Id.; accord Mitchell, 362 U.S. at 550 ("What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence."); Earles v. Union Barge Line Corp., 486 F.2d 1097, 1105 (3d Cir. 1973) ("The [Supreme] Court has not melded the duty to provide a seaworthy vessel with the duty to provide a safe place to work, but has repeatedly stated that the two concepts of seaworthiness and negligence should remain separate and distinct.").

Liability for unseaworthiness is absolute. Mitchell, 362 U.S. at 549. "'It is essentially a species of liability without fault . . . .' [T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability." Id. (internal citations omitted); accord Usner, 400 U.S. at 498. This differs from negligence liability under the Jones Act. "Since the liability for unseaworthiness is predicated without regard to fault or the use of due care, it is irrelevant to the shipowner's liability how that condition came into being [or] whether there was complete control over the instrumentality causing the injury . . . ." Earles, 486 F.2d at 1102.

"To prevail on an unseaworthiness claim, a plaintiff must show that 'the unseaworthy condition of the vessel was the proximate or direct and substantial cause of the seaman's injuries.'" Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 439 (4th Cir. 1999) (citations omitted). This causation burden is "more demanding" than the one imposed on plaintiff by the Jones Act. Id.; accord Gavagan v. United States, 955 F.2d 1016, 1019 n.7 (5th Cir. 1992).

20

Plaintiff argues that three conditions of the Mendonca rendered the vessel unseaworthy: the conduct of First Engineer Hopkins, "the inoperative condition of the elevator," and "the faulty conditions in the engine room."  (Pl.'s Resp. 16–17.)  The Court examines each of these conditions in turn.

### 1.      The Conduct of First Engineer Hopkins

#### a.      The Alleged Assault

The warranty of seaworthiness, as applied to a seaman, is "not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling."  Boudoin, 348 U.S. at 337 (quotation marks and citations omitted). If one seaman has assaulted another, the plaintiff may recover on an unseaworthiness claim if the assailant has "a proclivity for assaulting people . . . , a wicked disposition, a propensity to evil conduct, [and] a savage and vicious nature [such that] the ship becomes a perilous place."  Id. at 339–40.  An "assault within the usual and customary standards of the calling" is insufficient; the seaman must have "such savage disposition as to endanger the others who worked on the ship." Id.; accord Wiradihardja v. Bermuda Star Line, Inc., 802 F. Supp. 989, 994 (S.D.N.Y. 1992).  As the doctrine has developed, "[c]ourts look to a number of factors . . . :  (a) provocation, (b) severity of injury, (c) prior and subsequent acts of violence, (d) use of weapons, (e) physical differences, and (f) a planned attack or intent to kill."  Macke v. Mississippi Belle II, Inc., 212 F. Supp. 2d 1069, 1076 (S.D. Iowa 2002) (citations omitted).  Moreover, cases that have found unseaworthiness based on the conduct of a seaman "inevitably contain an egregious assault . . . . Cases which hold the shipowner liable are, without exception, cases where the assailant uses a deadly weapon or dangerous instrument in the assault."  Id. (internal quotation marks and

citations omitted); see also Smith v. Lauritzen, 356 F.2d 171, 177 (3d Cir. 1966) (holding that mere words cannot be sufficient provocation for an attack using a deadly or dangerous weapon).

Applying these principles, the Macke court failed to find that a vessel was rendered unseaworthy when plaintiff's supervisor allegedly slammed her shoulder into plaintiff on multiple occasions. 212 F. Supp. 2d at 1076. In comparison, the evidence in the instant case is less indicative of a savage and vicious nature on the part of First Engineer Hopkins. The only evidence of a physical attack on plaintiff is the incident in which First Engineer Hopkins called plaintiff a "fucking liar" and allegedly menaced him physically. (Def.'s Mot. 4; Pl.'s Resp. 6; Sloan Dep. 90:18–93:7; Ippolito Dep. 43:3–44:5.) This incident did not involve a weapon or physical injury. Accordingly, the assault did not reach the level of savageness necessary to render a vessel unseaworthy.

### b.    The Alleged Emotional Abuse

With respect to the alleged emotional abuse, the Third Circuit has held that the "zone of danger" test that applies to claims for emotional distress brought under the Jones Act also applies to unseaworthiness claims. Perna v. Arco Marine, Inc., 2001 A.M.C. 1147, 1152 (3d Cir. 2001) (holding that as emotional distress absent the requisite zone of danger is not compensable under the Jones Act, "allowing [it] to go forward in the guise of an unseaworthiness claim 'would be inconsistent with our place in the constitutional scheme.'" (citing Miles v. Apex Marine Corp., 498 U.S. 19, 32–33 (1990))). The Sixth Circuit, sitting en banc, reached the same conclusion, holding that "[w]here an injury is not remediable under the Jones Act, . . . neither can the doctrine of unseaworthiness offer redress." Szymanski v. Columbia Transp. Co., 154 F.3d 591, 595 (6th Cir. 1998) (en banc). Thus, the same "zone of danger" test applies to any claim by

22

plaintiff that the emotional distress caused by First Engineer Hopkins rendered the Mendonca unseaworthy.

In Part V.A.3, *supra*, the Court ruled that the alleged assault on plaintiff by First Engineer Hopkins satisfied the immediate risk of physical harm prong of the <u>Gottshall</u> zone of danger test. While the details of the altercation between plaintiff and First Engineer Hopkins are in dispute, plaintiff has presented evidence that the altercation caused him emotional distress and that he was menaced physically, placing him in immediate risk of physical harm by First Engineer Hopkins.  Such evidence suffices to make out a claim for unseaworthiness.  Accordingly, the Court denies defendant's Motion for Summary judgment with respect to this claim.

### 2.        The Inoperative Elevator

It is undisputed that the ship's elevator was broken, requiring plaintiff and other crew members to use the stairs to travel between decks.  (Def.'s Reply 8–9; Pl.'s Resp. 4; Sloan Dep. 45:1–7, 113:2–17; Ippolito Dep. 48:8–49:7.)  The test for seaworthiness, as stated by the Supreme Court in <u>Mitchell</u>, is whether the "vessel [is] reasonably suited for her intended service."  362 U.S. at 550.  As a matter of law, a defective elevator can render a ship unseaworthy.  <u>See</u> <u>United States v. S.F. Elevator Co.</u>, 512 F.2d 23, 25–26 (9th Cir. 1975) (reciting the district court holding that a seaman's death in a defective elevator was caused by the ship's unseaworthiness).

Moreover, plaintiff has presented evidence that the nonworking condition of the elevator contributed to his stroke.  Plaintiff's expert stated that "all of the activities that went on as [plaintiff's counsel] enumerated in [his] letter" had a "causal relationship" to plaintiff's stroke. (Report of Dr. Jahromi 2, Jan. 22, 2009, Ex. 5 to Pl.'s Resp.)  The letter from plaintiff's counsel,

in describing the conditions onboard the Mendonca leading up to plaintiff's stroke, included the fact that the elevator was inoperative.  (Letter from Stanley B. Gruber, Esq. to Dr. Heidar K. Jahromi 2 (Jan. 6, 2009), Ex. 7 to Pl.'s Resp.)  Such evidence of causation suffices to withstand a motion for summary judgment.  Accordingly, the Court denies defendant's Motion for Summary Judgment on this claim.

### 3.     The Engine Room Conditions

Plaintiff also argues that "the faulty conditions in the engine room" caused the Mendonca to be unseaworthy.  (Pl.'s Resp. 16–17.)  The evidence of the faulty conditions is as follows:  (1) plaintiff testified that while he was adding chemicals to the main engine air cleaner dosing tank, he was splashed, requiring medical attention; (2) plaintiff testified that this accident was the result of First Engineer Hopkins changing the position of the valves to the tank without telling plaintiff, but, at his deposition, First Engineer Hopkins denied this allegation; (3) Third Engineer Ippolito testified that people were "messing around" with equipment in the engine room without his knowledge and setting off alarms; and (4) plaintiff testified that Chief Engineer Graham's decision to operate the ship with an unmanned engine room was dangerous.

With respect to causation, plaintiff proffers Dr. Jahromi's report stating that "it is my opinion that because of the fact that he was under a tremendous amount of stress the day that he had a stroke, because of all of the activities that went on as you enumerated in your letter [which included the allegedly unseaworthy conditions], it is my professional opinion with reasonable amount of medical certainty that there is causal relation between what went on [onboard] the ship that day and [plaintiff's] stroke."  (Report of Dr. Jahromi 2, Jan. 22, 2009, Ex. 5 to Pl.'s Resp.)

While some of this evidence is disputed, for the purposes of a motion for summary

24

judgment, the "facts must be viewed in the light most favorable to the party opposing summary judgment." Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). Viewed in this light, plaintiff's claim that unseaworthy conditions in the engine room contributed to his stroke withstands summary judgment.  Accordingly, the Court denies defendant's Motion for Summary Judgment on this claim.

## VI.   CONCLUSION

For all of the foregoing reasons, the Court grants in part and denies in part Defendant United States of America's Motion for Summary Judgment.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES G. SLOAN** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 08-1423** |
| | : | |
| **UNITED STATES OF AMERICA** | : | |
| **Defendant.** | : | |

## O R D E R

AND NOW, this 25th day of March, 2009, upon consideration of Defendant United

States of America's Motion for Summary Judgment (Document No. 12, filed November 25,

2008); Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment of

Defendant United States of America (Document No. 15, filed January 23, 2009); and Reply of

the United States to Plaintiff's Opposition to Motion for Summary Judgment (Document No. 16,

filed January 29, 2009), for the reasons set forth in the attached Memorandum, **IT IS**

**ORDERED** that Defendant United States of America's Motion for Summary Judgment is

**GRANTED IN PART** and **DENIED IN PART**, as follows:

1.      With respect to plaintiff's Jones Act claim for assault, the motion is **GRANTED**;

2.      With respect to plaintiff's Jones Act claim for intentional infliction of emotional distress,

the motion is **GRANTED**;

3.      With respect to plaintiff's Jones Act claim for negligent infliction of emotional distress,

the motion is **DENIED**;

4.      With respect to plaintiff's Jones Act claim for negligence, the motion is **DENIED**;

5.      With respect to plaintiff's unseaworthiness claim for the conduct of First Engineer

Hopkins, the motion is **GRANTED IN PART** and **DENIED IN PART**, as follows:

a.      With respect to the alleged assault by First Engineer Hopkins, the motion is

**GRANTED**;

b.      With respect to the alleged emotional abuse by First Engineer Hopkins, the

motion is **DENIED**;

6.      With respect to plaintiff's unseaworthiness claim for the inoperative elevator, the motion

is **DENIED**;

7.      With respect to plaintiff's unseaworthiness claim for the conditions of the engine room,

the motion is **DENIED**;

8.      In all other respects, Defendant United States of America's Motion for Summary

Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that the parties, through counsel, shall jointly **REPORT**

to the Court (letter to Chambers, Room 12613) on or before April 9, 2009, as to whether the case

is settled.  In the event that the case is not settled on or before April 9, 2009, counsel shall

include in their joint report a statement as to whether they believe that a settlement conference

before a magistrate judge or mediation under Local Civil Rule 53.3 and the Mediation Protocol

under Local Civil Rule 53.3 might be of assistance in resolving the case and, if so, on what form

of alternative dispute resolution they agree and by what date they will be prepared to begin such

proceedings.  In the event that the case is not settled, it will be **REFERRED** to a panel of

arbitrators for trial at an early date.

**BY THE COURT:**

**/s/ Honorable Jan E. DuBois**
      **JAN E. DUBOIS, J.**